

FILED

2012 Jul-05  PM 01:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **CAROLYN JONES,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| **v.** | ) | |
| | ) | Civil Action Number |
| **THE WATER WORKS BOARD** | ) | **2:10-cv-1323-AKK** |
| **OF THE CITY OF** | ) | |
| **BIRMINGHAM,** | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the court is Defendant the Water Works Board of the City of Birmingham's ("WWB") motion for summary judgment, doc. 32, and Plaintiff Carolyn Jones' ("Plaintiff") motion for leave to file a sur-reply, doc. 50. For the reasons stated more fully herein, the WWB's summary judgment motion is **GRANTED** as it relates to Plaintiff's Title VII sex discrimination and racial harassment claims, 42 U.S.C. § 1981 claims, and state law claims for intentional infliction of emotional distress and negligent hiring, supervision, training, and retention, but **DENIED** as it relates to Plaintiff's Title VII discriminatory discharge and retaliation claims. Plaintiff's motion for leave to file a sur-reply is **DENIED**.

A Pretrial Conference will be held on **September 6, 2012 at 8:00 A.M. in the Chambers of the Undersigned at the Hugo L. Black United States**

**Courthouse in Birmingham, Alabama**.  This case is set for jury trial on **October 15, 2012 at 9:00 A.M. at the Hugo L. Black Courthouse in Birmingham, Alabama**.

## I.   STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  To support a summary judgment motion, the parties must cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c).  Moreover, "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of proving the absence of a genuine issue of material fact.  *Id*. at 323.  The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial."  *Id*. at 324 (citation and internal quotation marks omitted).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party.  *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor).  However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion."  *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)).  Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."  *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II.   FACTUAL AND PROCEDURAL BACKGROUND

This action arises from Plaintiff's former employment with the WWB, which is an Alabama public corporation pursuant to Ala. Code § 11-50-231 (1975).  Doc. 33-1, at 2.  Plaintiff, an African American female, began working for the WWB in September 2006 as an Administrative Assistant II for the Engineering Department's chief engineer, Howard Richards ("Richards").  Doc. 35-1, at 4.  Mac Underwood ("Underwood"), the WWB's General Manager, discharged Plaintiff on July 11, 2008 due to "unsatisfactory job performance."  Doc. 35-2, at 111.  More specifically, in Plaintiff's termination letter, Underwood provided: "it has been determined that [1] you have acted rudely and unprofessional[ly] towards

customers, co-workers and management which has caused morale problems and a

disruption in the Engineering Department, and [2] have been late to work on

numerous occasions.  In addition, [3] you ordered flowers from the wife of the

Board's Chief Engineer, Howard Richards, for the EPA Awards Luncheon which

was a violation of the Board's Conflict of Interest Policy (Section 6.5 in the

Employee Handbook) and [4] purchased shirts for Engineering outside of the

Purchasing Department, without reimbursing the Board, all of which is a violation

of the Purchasing Guidelines and Uniform Policy."  *Id.*

A.    *Termination Justifications*

   i.    **Complaints of Rude and Unprofessional Conduct**

   On June 6, 2008, Stacy Finch ("Finch"), a Caucasian female, and the then

acting-Manager for the WWB's System Development Department, emailed T.M.

"Sonny" Jones ("Sonny Jones"), the Assistant General Manager for Engineering,

regarding Plaintiff's conduct.  Doc. 35-2, at 112.  In the email, Finch described an

incident that occurred that morning where she asked Plaintiff to take a message

because the employee Finch wanted to check with about office space was

unavailable.  Apparently prompted for more information, Finch described a

possible office-space move that Sonny Jones approved.  Allegedly, Plaintiff

"sarcastically responded with 'Ooh well that's typical - HE supersedes everything

without checking with anyone anyway.'"  *Id.*  When Finch suggested that Plaintiff

could speak to Sonny Jones directly, Plaintiff purportedly stated "'NO, I'm not

dealing with him.'"  *Id.*  Furthermore, Finch reported in the email that "I know for

a fact that [Plaintiff] has been very rude and disrespectful to as many as five other employees on this floor alone, as well as with one consultant." *Id.*

Sonny Jones took Finch's email to the WWB's Human Resources Department ("HR"), which, in turn, conducted an investigation. *See* doc. 36-7, at 11.[1]  When Plaintiff received notice of Finch's complaint on June 9, 2008, Plaintiff submitted a letter to the WWB's HR manager Paul Lloyd ("Lloyd") complaining of discrimination and retaliation by Finch and Sonny Jones.  Doc. 35-2, at 109.  Plaintiff provided that: "In the past, I have had negative experiences with Mr. Jones.  Mr. Jones is very disrespectful and unprofessional towards me as a black female.  He has shown blatant prejudice by consistently using racist terms such as 'you people' to describe minorities." *Id.*

As a result, HR also investigated Plaintiff's allegations.  *See* doc. 37-1, at 28 (Underwood testifying that the WWB investigated Finch and Plaintiff's complaints at the same time).  HR initially tapped Sonny Jones to lead the investigation regarding Finch's complaints against Plaintiff.  However, after Plaintiff's letter accusing Jones of discrimination, Underwood took charge of the investigation.  Doc. 37-1, 15.  As it relates to the substance of this investigation, Lloyd testified that "we only want to extend the investigation and interview those

_____

[1] Section 6.7 of the WWB's Employee Handbook provides: "Employees are expected to perform their jobs efficiently, effectively, and in accordance with established procedures. Examples of unacceptable performance include: . . . Insubordination, willful disobedience or failing to follow management directions; unprofessional conduct or rudeness to customers . . . ." Doc. 35-1, at 133.

who we believe would have some insight into the investigation.  We don't want to stretch it out to people that don't - - may not have any insight into it, because you've got a potential for rumors and things like that to get started." Doc. 37-6, at 77.  As such, HR and Underwood interviewed various WWB managers and employees.  *See* doc. 33-1, at 2-5.

The interview notes of Vanessa Washington, an eye witness to the June 6, 2008 interaction between Finch and Plaintiff, provide that Washington described the nature of Finch and Plaintiff's conversation as "joking[,] did not think anything about it," doc. 33-3, at 2, and that Washington had no recollection of Plaintiff's purported derogatory statements regarding Sonny Jones, *id.* Washington also denied hearing Sonny Jones use the phrase "you people" in a derogatory manner; however, Washington reported that Sonny Jones occasionally failed to respectfully acknowledge certain African American WWB employees. *Id.* at 2-3.  Similarly, the interview notes from Kelsey Baugh, an intern who was also present for the June 6, 2008 interaction between Finch and Plaintiff, provide that Baugh found nothing rude or disrespectful about the conversation, doc. 33-4, at 2, and that Baugh had no recollection of Plaintiff stating that Sonny Jones "supersedes everything," but that Plaintiff may have stated that she refused to deal with Sonny Jones, *id.*  Baugh also had no recollection of Sonny Jones using the phrase "you people" in a derogatory manner or any other disrespectful behavior by Sonny Jones.  *Id.* at 2-3.

Perhaps because the eye witnesses did not corroborate Finch's contentions,

HR decided to interview other individuals to inquire about Plaintiff's general conduct.  Unlike the investigation into Finch's allegations, this investigation revealed complaints regarding Plaintiff's behavior.  Specifically, the June 26, 2008 interview notes for Jennifer King provide that Plaintiff treated her rudely including an abrasive attitude and tone.  Doc. 33-7, at 2.  Similarly, the June 27, 2008 interview notes for Derrick Murphy state that Murphy found Plaintiff's strong and straightforward temperament disrespectful and unprofessional.  Doc. 33-9, at 2.  Project coordinator Reginald Miller asserted in his June 27, 2008 interview that he heard Plaintiff talk to a customer in an unprofessional manner.  Doc. 33-10, at 2.  On June 30, 2008, principal engineer Patty Barron described Plaintiff as "wicked" and, although sometimes Plaintiff "can be nice as she can be," Barron also stated that Plaintiff caused tension in the engineering department.  Doc. 34-3, at 2.  Jeff Cochran, another engineer, provided on June 30, 2008, that "early on," Plaintiff treated him unprofessionally and disrespectfully, but that "she has gotten better over the last three or four months."  Doc. 34-4, at 2.  Finally, Jonathan Wilson, an engineer, maintained in his July 1, 2008 interview that Plaintiff can cause a more stressful working environment, but that "she has her days - very helpful and goes beyond."  Doc. 34-5, at 2-3.  The HR interviewer never asked these employees about Sonny Jones' purported disrespectful and discriminatory actions.  *See* docs. 33-7, 33-9, 33-10, 34-1, 34-3, 34-4, 34-5.

Conversely, Richards stated in his June 20, 2008 interview that he never witnessed any rude or disrespectful behavior by Plaintiff—although, Richards also

admitted that he received complaints about Plaintiff's conduct from Walter Garner, Jennifer King, and Derrick Murphy. Doc. 33-5, at 2-3. As it relates to Sonny Jones, Richards provided that he never witnessed Sonny Jones make an offensive statement to Plaintiff or anyone else "with words, but with behavior. As a black male, if you are talking to someone and they turn their face away from you or they joke about the way you said something." *Id.* at 2. However, HR reported that when it asked, Richards could not provide an example. *Id.* On the other hand, later in the interview notes when asked for any additional information, Richards provided that he "[h]as been in a conversation and Sonny walked right in and start[ed] talking to the person he was talking to without saying excuse me. Howard found it rude and disrespectful. Examples: when talking to Patrick and Darryl." *Id.* at 4.

Three other employees also reported no problems with Plaintiff. Peter Gioka, an engineer, never received any rude treatment from Plaintiff and had no knowledge of any such disrespectful behavior. Doc. 33-6. Similarly, Richard Jacobs, a principal engineer, provided in his June 27, 2008 interview that he appreciated Plaintiff's candor and joking, and as such, reported no rude, unprofessional, or disrespectful treatment by Plaintiff. Doc. 34-1. Cary Prather, the environmental service manager, also reported no rude treatment by Plaintiff and stated that Plaintiff's tone with customers is condescending but that she "tries to help them and will give them her number for them to call back if they still have problems." Doc. 34-2. The interviewer apparently never asked Gioka, Jacobs, or

Prather about Sonny Jones' alleged discriminatory behavior.  *See* docs. 33-6, 34-1, 34-2.[2]

### ii.    Tardiness

In addition to Plaintiff's purported rude behavior, the WWB contends also that it discharged Plaintiff for excessive tardiness.  This conduct is not in dispute.  Indeed, Plaintiff admitted to occasions of tardiness.  Doc. 35-1, at 44.  The WWB's records indicate that Plaintiff arrived late for work seventeen (17) days in April 2008 and fourteen (14) days in May 2008.  Doc. 36-8, at 32.  However, Richards testified that he had a discussion with Underwood regarding Plaintiff's tardiness where Richards stated that "Carolyn [Jones] is a good employee, she's very productive, she works late, she works during her lunchtime.  And there are times she would ask to come in late and I would allow it."  Doc. 35-3, at 70.  Underwood purportedly consented to this arrangement even though, some time prior to terminating Plaintiff, he issued a general communication that managers

---

[2] As it relates to rude and unprofessional behavior as a justification for Plaintiff's termination, the court agrees with Plaintiff that the McCarroll, doc. 37-8,  Miller, doc. 37-9, Murphy, 37-10, and White, 37-11, affidavits submitted by the WWB are irrelevant for summary judgment purposes.  *See* doc. 41, at 5-8; *see also* doc. 48.  Put simply, while these affidavits provide additional evidence regarding Plaintiff's behavior, the affidavits offer no indication that the WWB's decision-makers possessed knowledge of this additional evidence when discharging Plaintiff.  In other words, the WWB cannot claim that it depended upon these affidavits to discharge Plaintiff when the affiants gave this testimony over three years *after* Plaintiff's termination (October 2011).  *See McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 359-60 (1995) (establishing that an employer cannot rely on evidence of misconduct it discovered after an employee's termination, termed "after acquired evidence," because the "employer could not have been motivated by knowledge it did not have"); *see also Conroy v. Abraham Chevrolet-Tampa, Inc.*, 375 F.3d 1228, 1232 (11th Cir. 2004); *Chapman v. AI Transport*, 229 F.3d 1012, 1068 n.101 (11th Cir. 2000).

and supervisors should not tolerate tardiness. *Id*. at 58-59, 70. Consistent with the arrangement Plaintiff had with Richards, Plaintiff received no reprimand or other discipline for tardiness prior to her discharge. Doc. 37-1, at 36.

Moreover, Plaintiff submits evidence that Tammy Wilson ("Wilson"), Sonny Jones' Caucasian Administrative Assistant, committed similar infractions and was not discharged. Specifically, Wilson's employee file reveals that she received a "written warning" on June 22, 2007 for arriving "to work approximately 10 to 15 minutes late . . . on Thursday, June 21 and Friday, June 22." Doc. 40-34, at 4. Wilson also received a "final warning or suspension" on February 29, 2008 because "[d]uring the month of January 2008, [Wilson was] tardy (late for work) at least 6 times based on the time you entered the main gate . . . . We discussed this with you on numerous occasions during 2007. We also discussed this with you the first week of January 2008. You were requested to correct this problem by arriving to work on time. Since you have continued to be tardy during January 2008, I am suspending you for four (4) business days, March 3, 4, 5, and 6, 2008." *Id.* at 5. Despite these and subsequent tardiness infractions, Lloyd, the HR manager, testified that, as of September 29, 2011, the WWB still employed Wilson. Doc. 37-6, at 49-50.

### iii.    EPA Awards Luncheon Flower Arrangements Purchase

The third justification for Plaintiff's discharge involved an alleged breach of the conflict of interest policy. On April 28, 2008, the WWB held a luncheon at the Harbert Center in Birmingham, Alabama to honor the Board for receiving an

Environmental Protection Agency ("EPA") outstanding achievement award.  Doc. 37-1, at 40, 44.  Plaintiff ordered the flowers for this luncheon from "Floral Designs by Maureen Richards."  Doc. 35-2, at 105.  Maureen Richards is the wife of Plaintiff's supervisor, Howard Richards.  Doc. 35-1, at 25.  While the parties agree that Richards knew about the flower purchase from his wife, *see* doc. 35-3, at 52; doc. 35-1, at 25, the parties disagree whether Underwood approved the purchase.  Plaintiff testified that she told Underwood about the flowers prior to the luncheon, and Underwood informed her that such purchase conformed with the WWB's conflict of interest policy because third-party sources funded the luncheon.  Doc. 35-1, at 25.  Conversely, Underwood testified that he only became aware that Richards' wife supplied the flower arrangements after the luncheon.  Doc. 37-1, at 43.  Underwood also testified that "I told Howard [Richards] that there was a conflict with him or Carolyn [Jones] ordering flowers from his wife for benefit for her," and accordingly, Underwood recommended that Richards contact Mary Thompson, an attorney for the WWB.  *Id.* at 43-44.  Moreover, Richards similarly provided that, following the luncheon, Underwood asked him to speak with Mary Thompson about the potential conflict of interest, and Thompson stated that the transaction "would be okay because it was private money that was going to pay for [the flowers], not public money."  Doc. 35-3, at 53.[3]

---

[3] The WWB attempts to utilize the attorney-client privilege as it relates to these statements by Mary Thompson.  *See* doc. 47, at 8 ("[S]ince [Richards] contacted the Board's attorney at the direction of the Board's General Manager to seek legal advice for the Board and not [Richards] personally, any subsequent conversation between the [Richards] and the Board's

Case 2:10-cv-01323-AKK   Document 52   Filed 07/05/12   Page 12 of 31

On May 7, 2008, Plaintiff sent Underwood an email regarding payment for the flower arrangement purchase. *See* doc. 40-4. In this email, Plaintiff stated: "Mac, our attorney declared no conflict of interest because [Maureen Richards] would be paid with private funds as was the Harbert Center. Please tell me what I can tell her if she is not getting paid or would you please arrange for someone to pay for decorating the Harbert Center for the EPA Award Luncheon." *Id.* Underwood responded on May 8, 2008: "Elements [a private public relations firm] has committed to taking care of this as soon as they can. They have talked to the provider (Flowers by Maureen) and everything is ok." *Id.* Ultimately, Malcolm Pirnie, a private engineering firm, paid Maureen Richards for the flower arrangements. Doc. 37-1, at 41; doc. 35-3, at 53.

The WWB's conflict of interest policy prohibits participation "in activities that conflict or appear to conflict with the business interests" of the Board, and include "[d]eveloping a relationship with a customer or other business contact that may jeopardize an employee's independent judgment." Doc. 35-1, at 131. In May

---

attorney is subject to the attorney-client privilege."). The court disagrees because "'litigants cannot hide behind the privilege if they are relying upon privileged communications to make their case. "The attorney-client privilege cannot at once be used as a shield and a sword."'" *New Phoenix Sunrise Corp. v. C.I.R.*, 408 F. App'x 908, 919 (6th Cir. 2010) (quoting *In re Lott*, 424 F.3d 446, 454 (6th Cir. 2005) (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991))). As such, "the privilege may implicitly be waived when defendant asserts a claim that in fairness requires examination of protected communications." *Bilzerian*, 926 F.2d at 1292. Here, the WWB maintains that it discharged Plaintiff because she clearly violated the Board's conflict of interest policy. *See* doc. 47, at 14-15. However, Plaintiff submits evidence that the WWB's attorney may have opined just the opposite—that Plaintiff's conduct comported with this policy. As such, the court will consider this evidence over the WWB's attorney-client privilege objections.

Page 12 of 31

2008, at the direction of Underwood, Sonny Jones allegedly began an investigation into a potential conflict of interest policy violation as it relates to the flower arrangements purchase.  Doc. 36-7, at 28.  Sonny Jones requested that Lloyd and HR handle the investigation, *id.*, and Lloyd testified that—even though a third party vendor paid for the flower arrangements—Plaintiff still violated the WWB's conflict of interest policy because she failed to notify management about the personal relationship involved.  Doc. 37-6, at 16.

### iv.    Engineering Department T-Shirt Purchase

The final rationale for Plaintiff's discharge involved an alleged violation of the purchasing guidelines that occurred a year earlier.  In May 2007, Plaintiff facilitated the purchase of departmental t-shirts from "The Greek Shop."  Doc. 35-1, at 13.  Richards approved the check request for this t-shirt order, doc. 35-2, at 91, but Plaintiff failed to utilize the Purchasing Department for this check requisition, doc. 35-1, at 13.  Rather, Plaintiff took the check requisition form to the Accounting Department, which, in turn, issued a check to The Greek Shop.  *Id.* at 15.  Plaintiff testified that she never reviewed the purchasing guidelines to ascertain compliance, *id.*, but Plaintiff attended a training class on the purchasing guidelines on October 19, 2006 and possessed a copy of these guidelines, *id.* at 12.  Richards stated that he initiated the t-shirt purchase by instituting a departmental logo design competition to improve morale and productivity within the Engineering Department.  Doc. 35-3, at 54.  Richards further provided that Darrell Jones and Sonny Jones approved the competition, agreed to serve as judges, and

received, along with Underwood, *see* doc. 37-1, at 65, the finished t-shirt from The Greek Shop, doc. 35-3, at 54.  However, Richards never met with the Purchasing Department to discuss the t-shirt purchase.  *Id.* at 54-55.  In addition, Sonny Jones testified that these departmental t-shirts violated the "written uniform policy." Doc. 36-7, at 23.  Underwood corroborated this testimony by providing that the WWB issues employee uniforms, "[s]o to purchase a shirt that has a different logo, that was different than the uniform policy violated that uniform policy."  Doc. 37-1, at 116.

Moreover, Underwood testified that, in May or June 2008, a year *after* the purchase, an employee in the Purchasing Department raised the issue that the Engineering Department had failed to properly go through the Purchasing Department.  Doc. 37-1, at 65.  Sonny Jones began investigating this matter and eventually Underwood investigated the possible violation of the purchasing guidelines.  Doc. 36-7, at 10.  Underwood testified that "[t]he Board's purchasing guidelines require that all purchases need to go through the purchasing department . . . [and] purchasing is [also] suppose to . . . verify and approve vendors that we can purchase from."  Doc. 37-1, at 116.  It is undisputed that The Greek Shop is not an approved vendor.  *Id.*  The WWB also offers a June 4, 2008 email from Greta K. Threadgill, a "Senior Buyer" for the Purchasing Department, to Lloyd stating that "I told Carolyn Jones when she asked about the design for an Engineering Dept. Shirt and I told her then that the Water Works will not pay for those shirts.  She told me that Howard was giving them for Christmas presents . . .

." Doc. 36-9, at 171.  However, in forwarding this email to Sonny Jones and Underwood on June 10, 2008, Lloyd asserted that he failed to include "the shirt issue" in his proposed warnings to Richards and Plaintiff, *see infra*, "due to this being a gray area to me."  *Id.*  Plaintiff, on the other hand, denies ever discussing the departmental t-shirt purchase with Threadgill.  Doc. 35-1, at 13.

B.      *The Corrective Action Form*

On June 6, 2008, Lloyd emailed Sonny Jones and Underwood a proposed "Corrective Action Form" for Richards regarding the flower arrangement purchase.  *See* doc. 40-7.  Lloyd proposed a "Final Warning" for Richards based on the conflict of interest and appearance of improper personal benefits.  *Id.* at 3.  As it relates to Plaintiff, the proposed Corrective Action Form provided "Howard [Richards] needs to ensure that his assistant Carolyn Jones is aware of all company policies and state ethics laws related to these types of activities and Howard should issue the appropriate corrective action to Carolyn for violation of company policy as stated above as she ordered the flowers for the EPA luncheon from Howard's wife."  *Id.*  Furthermore, as previously noted, Lloyd's email stated "I did not include the issue about the shirts as this was a gray area to me."  *Id.* at 2.  Underwood disagreed with Lloyd and decided to discharge Plaintiff instead for "unsatisfactory job performance."  Doc. 35-2, at 111.  Moreover, on July 22, 2008, eleven days after discharging Plaintiff, the WWB terminated Richards for virtually the same reasons.  Doc. 35-10, at 43.

Section 5.2 of the WWB's Employee Handbook provides that "[w]hile the

Organization supports the use of progressive discipline, it may, at any time, institute any form of corrective action it solely deems appropriate based upon the situation, up to and including immediate termination." Doc. 35-1, 115.  The "Corrective Action" subsection maintains that "[i]n general, these steps may be followed in cases of violation of one or more rules/policies within a twelve-month period.  (1) Verbal Warning, (2) Written Warning, (3) Final Warning or Suspension, (4) Termination." *Id.*  Prior to her termination, Underwood testified that Plaintiff's employee file contained no complaints for being rude, tardy, disrespectful, or violating any other WWB policies.  Doc. 37-1, at 36.  And indeed, there is no evidence that Plaintiff received a Corrective Action form prior to her termination. *See id.* at 36-37.  However, given the purported justifications for termination taken as a whole, Underwood decided to discharge Plaintiff on July 11, 2008. *Id.* at 125.

C.      *The EEOC Charge and Complaint*

On July 23, 2008, Plaintiff filed her Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging race and sex discrimination and retaliation. *See* doc. 35-2, at 106.  On September 30, 2009, the EEOC issued a Letter of Determination finding that "there is reasonable cause to believe that the Charging Party was terminated based on her race and in retaliation for making an internal complaint of race and sex discrimination, in violation of Title VII." Doc. 40-2, at 3.  After conciliation failed, Plaintiff filed her Complaint in this court on May 24, 2010, alleging (1) racial discrimination under Title VII

and 42 U.S.C. § 1981; (2) retaliation under Title VII and 42 U.S.C. § 1981; (3)

gender discrimination and harassment under Title VII; (4) intentional infliction of

emotional distress under state law; and (5) negligent hiring, supervision, training,

and retention under state law.  Doc. 1.  The WWB moved for summary judgment

on October 21, 2011, doc. 32, which is fully briefed, docs. 41, 47, and ripe for

review.

### III.   ANALYSIS

A.   *Gender Discrimination, Racial Harassment or Hostile Work Environment,
State Law, and § 1981 Discrimination Claims*

Although Plaintiff asserts claims against the WWB for gender

discrimination and racial harassment/hostile work environment under Title VII,

intentional infliction of emotional distress, and negligent hiring, supervision,

training, and retention, *see* doc. 1, at 7-16 (Complaint), she abandons these claims

in opposition to summary judgment.  *See generally* doc. 41 (addressing only

discriminatory discharge and retaliation claims).  Plaintiff never addresses the

WWB's arguments as it relates to these claims, *see* doc. 32-1, at 44-49, and in fact,

tacitly admits to abandoning these claims.  *See* doc. 41, at 4 n.1 ("Plaintiff is

pursuing only a claim of racial discrimination and retaliation relating to her

termination."); *id.* at 22 ("The affidavits submitted by Defendant do not provide

evidence relevant to the inquiry of whether Plaintiff was terminated based on her

race or in retaliation for her complaints.").  Moreover, the court finds the Board's

arguments persuasive and that, based on the record evidence before it, no

reasonable jury could find in favor of Plaintiff as it relates to these claims. *See United States v. One Piece of Real Property Located at 5800 SW 74th Avenue, Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004); *Walker*, 911 F.2d at 1577. Therefore, the court **GRANTS** the WWB's motion for summary judgment as it relates to the gender discrimination, hostile work environment, and state law claims.

In addition, the Board is due summary judgment on Plaintiff's § 1981 race discrimination and retaliation claims. The Eleventh Circuit provided in *Butts v. Cnty. of Volusia*, 222 F.3d 891, 893 (11th Cir. 2000), that "§ 1983 constitutes the exclusive remedy against state actors for violations of the rights contained in § 1981." *Id.* Put differently, the court "refused to find in § 1981 an implied cause of action against state actors because Congress had clearly established § 1983 as the remedial scheme against state actors." *Id.* at 894. *See also Brown v. Sch. Bd. of Orange Cnty., Fla.*, 459 F. App'x 817, 818-19 (11th Cir. 2012) ("Claims against state actors under § 1981 must be brought pursuant to 42 U.S.C. § 1983."). The WWB constitutes a "state actor" for purposes of § 1983, *see Newton v. Southeast Ala. Gas Dist.*, 708 F. Supp. 1254, 1259 (M.D. Ala. 1989); and accordingly, Plaintiff failed to properly assert her § 1981 claims pursuant to § 1983. *See generally* doc. 1. Therefore, the court **GRANTS** the WWB's summary judgment motion on the § 1981 discrimination and retaliation claims—however, in doing so, the court notes that Title VII and § 1981 claims "have the same requirements of proof and use the same analytical framework." *Standard v. A.B.E.L. Servs., Inc.*,

161 F.3d 1318, 1330 (11th Cir. 1998).  The court makes this notation because, as shown below, summary judgment on the Title VII claims is due to be denied.  The court is however granting the motion on the § 1981 claims since Plaintiff can only bring those pursuant to 42 U.S.C. § 1983.

B.    *Discriminatory Discharge*

In support of its motion for summary judgment on the Title VII discharge claim, the WWB relies on the burden-shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Doc. 32-1, at 35. Generally, under the *McDonnell Douglas* framework, the plaintiff must first create an inference of discrimination by establishing a *prima facie* case.  *Burke-Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (citation omitted).  "To establish a *prima facie* case for disparate treatment in a race discrimination case, the plaintiff must show that: (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside of her protected class more favorably than she was treated; and (4) she was qualified to do the job."  *Id.*  If the plaintiff satisfies her initial burden, "then the defendant must show a legitimate, non-discriminatory reason for its employment action."  *Id.* (citation omitted).  "If it does so, then the plaintiff must prove that the reason provided by the defendant is a pretext for unlawful discrimination."  *Id.* (citation omitted).  In other words, assuming the plaintiff establishes a *prima facie* case, and the defendant provides a legitimate, non-discriminatory reason for the adverse employment action, to show pretext, the

plaintiff must "cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'" *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (quoting *Cooper-Houston v. S. Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994)).

Based on this standard, the WWB argues that, "[a]lthough the Plaintiff is a member of a protected class and was qualified for her former position, she has utterly failed to establish that she suffered from differential application of work rules and discipline. Specifically, the Plaintiff has failed to show that she engaged in misconduct nearly identical to that of a person outside the protected class, and the discipline enforced against her was more severe than was enforced against others who engaged in the conduct outside the class." Doc. 32-1, at 37; doc. 47, at 12-15. Critically, however, the Eleventh Circuit recently instructed that "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case. Accordingly, *the plaintiff's failure to produce a comparator does not necessarily doom* the plaintiff's case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (emphasis added). *See also* doc. 41, at 65 (Plaintiff's opposition brief providing that no "strictly-analyzed comparator" exists).

Instead, where the plaintiff "presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent"—the essential

element of a claim for discrimination—"the plaintiff will always survive summary judgment." *Lockheed-Martin*, 644 F.3d at 1328.  And indeed, "a triable issue of fact exists if the record, viewed in the light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Id.* (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 733 (7th Cir. 2011)).  For purposes of summary judgment, the court finds that a jury could reasonably infer a discriminatory animus from the pretextual nature of the WWB's proffered termination justifications.  Put simply, "'it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation.'" *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004) (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000)).  *See* doc. 41, at 53-69.

   A genuine issue of material fact exists as to the prextextual nature—i.e. potential falsity—of each proffered justification for Plaintiff's discharge.  *See Evans v. McClain of Ga., Inc.*, 131 F.3d 957, 963 (11th Cir. 1997) ("[A] plaintiff can survive a motion for summary judgment . . . simply by presenting evidence sufficient to demonstrate a genuine issue of material fact as to the truth or falsity of the employer's legitimate, nondiscriminatory reasons.").  First, Underwood's discharge letter maintains that "it has been determined that [Plaintiff] acted rudely and unprofessional[ly] towards customers, co-workers and management which has caused morale problems and a disruption in the Engineering Department."  Doc. 35-2, at 111.  Generally, "'[f]or an employer to prevail the jury need not determine

that the employer was correct in its assessment of the employee's performance; it need only determine that the defendant in good faith *believed* plaintiff's performance to be unsatisfactory.'" *Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (quoting *Moore v. Sears, Roebuck & Co.*, 683 F.2d 1321, 1323 n.4 (11th Cir. 1982) (emphasis in original)).  Here, though, the HR interview notes regarding Plaintiff paint two distinct pictures.  As it relates to Plaintiff's purported abrasive and unprofessional interaction with Stacy Finch on June 6, 2008, the two eye witnesses—Washington and Baugh—reported no disrespectful or rude behavior.  *See* docs. 33-3, 33-4.  Additionally, the co-employee interviews reveal both unfavorable and favorable statements pertaining to Plaintiff's conduct and behavior toward customers, co-workers, and management.  *See* docs. 33-5, 33-6, 33-7, 33-9, 33-10, 34-1, 34-2, 34-3, 34-4, 34-5.  Taking the evidence in the light most favorable to Plaintiff, there is a genuine issue of material fact as to why Underwood—who relied on the HR interview statements as justification for discharging Plaintiff—disregarded the favorable statements, *see* doc. 37-1, at 59-63, including the two eyewitnesses who disavowed the conduct that led to the investigation concerning Plaintiff.  While the jury may ultimately conclude that Underwood, in good faith, properly determined that the unfavorable interview statements outweighed the favorable statements, a reasonable jury could also find that Underwood improperly or unjustifiably disregarded these favorable statements—thereby raising an inference of pretext as to this reason for discharge.

Additionally, the court notes the apparent disparity in the WWB's investigation of internal complaints.  In responding to Finch's complaint against Plaintiff, HR interviewed the witnesses to the actual incident and seemingly every other WWB employee that interacted with Plaintiff.  *See* docs. 33-5, 33-6, 33-7, 33-9, 33-10, 34-1, 34-2, 34-3, 34-4, 34-5.  Simultaneously, HR investigated Plaintiff's discrimination and retaliation complaints against Sonny Jones—a Caucasian male.  *See* doc. 37-1, at 28.[4]  However, the interview notes reveal that HR only inquired into Sonny Jones' alleged discrimination with Richards, Plaintiff, Washington, and Baugh.  *See* docs. 33-5, 33-6, 33-7, 33-9, 33-10, 34-1, 34-2, 34-3, 34-4, 34-5.  Again, a jury may deem proper the WWB's different treatment of Finch and Plaintiff's complaints, but, at the summary judgment phase, this disparity in treatment of a general complaint against an African American employee versus the treatment of an arguably more serious complaint against a Caucasian employee involving an allegation of racial discrimination constitutes additional circumstantial evidence of a discriminatory animus.

Second, the discharge letter cites Plaintiff's tardiness "on numerous

---

[4] As discussed previously, the substance of Plaintiff's allegations against Sonny Jones pertains to his use of the phrase "you people" in a discriminatory manner.  *See* doc. 35-2, at 109-110.  The WWB moved to strike any reference to this allegation against Sonny Jones as time barred.  Doc. 32-1, at 28-29.  More specifically, the WWB maintains that Plaintiff failed to file an EEOC charge regarding this "discrete discriminatory act" within the mandatory 180 days.  *Id.* at 28 (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 104-05 (2002)).  The court disagrees.  As it relates to the remaining claims (discriminatory discharge and retaliation), the relevance behind Sonny Jones' purported conduct is that Plaintiff complained about this conduct and the ensuing HR investigation into Sonny Jones—not the substance of the comment itself.

occasions" as additional justification.  Doc. 35-2, at 111.  However, the court finds that Richards' allowance of this tardiness and the WWB's treatment of Tammy Wilson's tardiness raise a genuine issue of material fact as to the falsity of this proffered justification.  Moreover, prior to Plaintiff's termination, she received no reprimand or other discipline for tardiness.  Doc. 37-1, at 36.  According to Richards, Plaintiff's immediate supervisor, Underwood consented to a work arrangement whereby Richards allowed Plaintiff to arrive for work late because Plaintiff worked later in the evening and through lunch.  *See* doc. 35-3, at 58-59, 70.  Given this testimony, the court finds a genuine issue of material fact as it relates to the pretextual nature of Plaintiff's discharge.  Put simply, Underwood cites tardiness as a reason for discharging Plaintiff even though he purportedly allowed Plaintiff to arrive late for work.  Moreover, the WWB apparently treated Wilson, Sonny Jones' Caucasian Administrative Assistant, differently.  Despite habitual tardiness, Wilson received a "written warning" and a "final warning or suspension," pursuant to the Board's progressive discipline "steps," and is still employed.  Doc. 40-34, at 4-5; doc. 37-6, at 49-50.  Thus, while Wilson may not constitute a "substantially similar" comparator under *McDonnell Douglas*, the disparate treatment regarding tardiness discipline for an individual outside of Plaintiff's protected class provides additional circumstantial evidence, consistent with *Lockheed-Martin*, for the discriminatory discharge claim.

Third, Underwood maintains that the WWB discharged Plaintiff because she "ordered flowers from the wife of the Board's Chief Engineer, Howard

Richards, for the EPA Awards Luncheon which was a violation of the Board's
Conflict of Interest Policy."  Doc. 35-2, at 111.  Although Underwood denies such,
Plaintiff testified that Underwood approved the purchase of flowers from
Richards' wife *prior* to the EPA Awards Luncheon.  Doc. 35-1, at 25.  This is the
quintessential issue of fact for a jury.  Assuming the veracity of Plaintiff's
testimony—an assumption the court is required to make at summary
judgment—Underwood approved a purchase and then subsequently discharged
Plaintiff for finalizing that very purchase.  A reasonable jury could certainly find
evidence of pretext in this alleged conduct by Underwood.  Furthermore,
regardless of Underwood's prior approval, the WWB claims that this purchase
violated the Board's conflict of interest policy.  The record evidence, taken in the
light most favorable to Plaintiff, however, demonstrates that the WWB's counsel
determined otherwise.  *See* doc. 35-3, at 53.  These seemingly contradictory
conclusions offer additional support to the "mosaic of circumstantial evidence that
would allow a jury to infer intentional discrimination by the decisionmaker."
*Lockheed-Martin*, 644 F.3d at 1328 (citations omitted).

Fourth, and finally, the discharge letter stated that Plaintiff "purchased shirts
for Engineering outside of the Purchasing Department, without reimbursing the
Board, all of which is a violation of the Purchasing Guidelines and Uniform
Policy."  Doc. 35-2, at 111.  Again however, this discharge justification arises
from conduct that Plaintiff's superiors approved.  Richards approved the check
requisition form to The Greek Shop on May 30, 2007, doc. 35-2, at 91, and the

WWB's Accounting Department authorized the check to The Greek Shop, doc. 35-1, at 15.  Given this tacit approval, there is no evidence that Plaintiff knowingly violated the WWB's purchasing guidelines.  Furthermore, while Underwood determined the purchase actually violated the WWB's policy, HR manager Lloyd found that the t-shirt purchase constituted a "gray area."  Doc. 40-7, at 2.  Additionally, the Engineering Department t-shirt purchase occurred in May 2007, over a year before Plaintiff's termination.  However, there is no evidence that the WWB ever reprimanded Plaintiff (or Richards) for this transaction prior to termination.  Similar to the other termination justifications proffered by the WWB, Plaintiff casts sufficient doubt on the veracity of the claim that the t-shirt purchase actually motivated the WWB to discharge Plaintiff.

As to the WWB's alternative argument that the court should limit *Lockheed-Martin* to its specific facts, *see* doc. 47, at 17-18, the court disagrees.  The WWB asserts four specific justifications for terminating Plaintiff, and accordingly, Plaintiff faces an uphill battle to name a substantially similar comparator.  *See, e.g.*, *Burke-Fowler*, 447 F.3d at 1323.   In such a case, *Lockheed-Martin* provides a mechanism for plaintiffs to offer circumstantial evidence of racial discrimination outside the strict *McDonnell Douglas* comparator analysis.  644 F.3d at 1328.  Here, the WWB's use of the progressive discipline "steps," rather than discharge, for Wilson's habitual tardiness and the seemingly minor investigation into Plaintiff's complaints of discrimination against Sonny Jones, as opposed to the extensive investigation into Finch's allegations of rude behavior by Plaintiff,

produce a reasonable inference of a discriminatory animus.  In addition, the

proffered justifications for Plaintiff's discharge appear highly pretextual at the

summary judgment phase.  Put simply, taken in the light most favorable to the

nonmovant, the WWB approved the conduct for which it subsequently terminated

Plaintiff and disregarded, with no explanation, contradictory accounts of

Plaintiff's behavior.[5]  Under *Lockheed-Martin*, Plaintiff "presents circumstantial

evidence that creates a triable issue concerning the employer's discriminatory

intent."  644 F.3d at 1328.  Therefore, the court **DENIES** the WWB's motion for

summary judgment on the discriminatory discharge claim.

C.    *Retaliation*

Moreover, Plaintiff sufficiently satisfies the *McDonnell Douglas* burden-

shifting framework for her Title VII retaliation claim—thereby precluding

summary judgment on this claim as well.  "A *prima facie* case of retaliation under

Title VII requires the plaintiff to show that: (1) she engaged in an activity

protected under Title VII; (2) she suffered an adverse employment action; and (3)

there was a causal connection between the protected activity and the adverse

---

[5] In response to summary judgment, Plaintiff also submits "Other Complaints of
Discrimination and/or Retaliation" made by various WWB employees.  Doc. 41, at 48.  Plaintiff
argues that this "me too" evidence contributes to her allegation of a discriminatory animus.  *Id.* at
68.  Conversely, the WWB contends that, under *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d
1261, 1286 (11th Cir. 2008), "me too" evidence is only relevant for "pattern or practice"
discrimination claims, and, additionally, this evidence should be excluded under Fed. R. Evid.
404(b).  Doc. 47, at 20-21.  The court finds it unnecessary to address this issue because Plaintiff
offers sufficient circumstantial evidence to survive summary judgment outside of the "me too"
evidence.  The court will consider the admissibility of this evidence for trial if the need arises.

employment action." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008).

"'These three elements create a presumption that the adverse action was the product of an intent to retaliate . . . . [T]he burden of production [then] shifts to the defendant to rebut the presumption by articulating a legitimate, non-discriminatory reason for the adverse employment action . . . . After the defendant makes this showing, the plaintiff has a full and fair opportunity to demonstrate that the defendant's proffered reason was merely a pretext to mask discriminatory actions.'" *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181-82 (11th Cir. 2010) (quoting *Bryant v. Jones*, 575 F.3d 1281, 1307 (11th Cir. 2009)).

There is no dispute that Plaintiff satisfies the first two *prima facie* elements for her retaliation claim—rather, the WWB contends that Plaintiff "cannot show a causal connection." Doc. 32-1, at 42. The court disagrees. As the case law states, "the causal link requirement under Title VII must be construed broadly; 'a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.'" *Olmstead v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998) (quoting *E.E.O.C. v. Reichhold Chem., Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993)). Moreover, "[t]he burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). Here, Plaintiff complained of discrimination and retaliation on June 9, 2008 in a letter to HR. *See* doc. 35-2, at 109-110. Approximately one month later, on July 11, 2008, the WWB discharged Plaintiff. *Id.* at 111. Additionally, on June

6, 2008, three days prior to Plaintiff's protected activity, HR recommended that Howard Richards receive a "Final Warning," for the purported conflict of interest violation, and that, in turn, "*Howard* should issue the appropriate corrective action to Carolyn [Jones]." Doc. 40-7 (emphasis added).  Rather than follow HR's recommendation for Richards to issue a corrective action to Plaintiff, the WWB decided to bypass Richards and discharged Plaintiff instead.  The close temporal proximity combined with the variation from HR's recommendation—occurring after Plaintiff complained about discrimination— satisfies the *prima facie* causal connection requirement.

Conversely, the WWB argues that Plaintiff sent her letter to HR, *see* doc. 35-2, at 109-110, *after* the Board "had already begun investigating and contemplating discipline for violations of the conflict of interest policy."  Doc. 32-1, at 43 (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001)).  As stated in *Breeden*, "Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."  532 U.S. at 272.  *See also Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) ("[I]n a retaliation case, when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation.").  However, in both *Breeden* and *Drago*, the precise adverse employment action contemplated by the

defendant before the plaintiff's statutorily protected activity actually occurred. The defendant in *Breeden* contemplated transferring plaintiff before the statutorily protected activity, and the plaintiff asserted that the transfer constituted an adverse employment action.  532 U.S. at 271-72.  Similarly, in *Drago*, the defendant considered demoting plaintiff five months prior to plaintiff's statutorily protected activity, and plaintiff alleged that this demotion served as the adverse employment action.  453 F.3d at 1307-09.  Conversely here, the evidence shows that, before HR received Plaintiff's complaint letter, the WWB contemplated disciplining Richards and asking Richards to discipline Plaintiff, doc. 40-7, doc. 37-1, at 69, doc. 37-6, at 65; however, there is no evidence that the WWB contemplated *discharging* Plaintiff prior to her statutorily protected activity.  *See id.*  As such, the court refuses to find Plaintiff's retaliation claim precluded under *Breeden* and *Drago*.

Having satisfied her *prima facie* case, the burden shifts to the WWB "to rebut the presumption by articulating a legitimate, non-discriminatory reason for the adverse employment action."  *Brown*, 597 F.3d at 1181-82.  The WWB satisfies this burden as its four termination justifications, *see supra*, are facially legitimate and non-discriminatory.  *See* doc. 35-2, at 111.  However, as also discussed above, for purposes of summary judgment, Plaintiff sufficiently demonstrates that the WWB's proffered termination reasons are pretextual. Therefore, the court **DENIES** the summary judgment motion on Plaintiff's retaliation claim.

D.    *Sur-reply Motion*

Finally, Plaintiff moves for "leave to file a Sur-Reply and/or [leave] to file a Supplemental Response to Defendant's Motion for Summary Judgment and Evidentiary Submissions." Doc. 50. As grounds for this motion, Plaintiff argues that the WWB's reply brief in support of its motion for summary judgment, doc. 47, presents "new arguments, issues and allegations that must be addressed" such that Plaintiff needs an opportunity to "provide a meaningful summary judgment response," doc. 50, at 1-2. Given that the court denied the WWB's summary judgment motion on the issues Plaintiff substantively opposed, the motion to file a sur-reply is **DENIED**.

## IV.    CONCLUSION

Based on the aforementioned reasons, Plaintiff may proceed to trial by jury on her Title VII discriminatory discharge and retaliation claims. All other claims are hereby **DISMISSED with prejudice**.


**DONE** this 5th day of July, 2012.

**ABDUL K. KALLON**
**UNITED STATES DISTRICT JUDGE**